Slip Op. 06-88

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| SHANDONG HUARONG MACHINERY CO., LTD., SHANDONG MACHINERY IMPORT & EXPORT CORPORATION, LIAONING MACHINERY IMPORT & EXPORT CORPORATION, AND TIANJIN MACHINERY IMPORT & EXPORT CORPORATION, | : <br> : <br> : <br> : <br> : <br> : <br> : Before: Richard K. Eaton, <br> : Judge |
| Plaintiffs, | : |
| v. | : Consol. Court No. 04-00460 <br> : Public Version |
| UNITED STATES, | : <br> : |
| Defendant, | : <br> : |
| AMES TRUE TEMPER, | : <br> : |
| Deft.-Intervenor. | : <br> : |

OPINION AND ORDER

[United States Department of Commerce's Final Results on heavy forged hand tools sustained in part, remanded in part]

Dated: June 9, 2006

*Hume & Associates, PC* (*Robert T. Hume*), for plaintiffs.

*Peter D. Keisler*, Assistant Attorney General, Civil Division, United States Department of Justice; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Stephen Carl Tosini*), for defendant.

*Wiley, Rein & Fielding, LLP* (*Timothy C. Brightbill, Michael W. Schisa*, and *Daniel B. Pickard*), for defendant-intervenor.

Eaton, Judge: This consolidated action[1] is before the court on competing USCIT Rule 56.2 motions for judgment upon the agency record filed by Shandong Huarong Machinery Co., Ltd. ("Huarong"), Liaoning Machinery Import & Export Corp., Ltd. and Liaoning Machinery Import & Export Corp. (collectively "LMC"), Shandong Machinery Import & Export Corp. ("SMC"), and Tianjin Machinery Import & Export Corp. ("TMC") (collectively "plaintiffs"), and by defendant-intervenor Ames True Temper ("Ames").

By their motions, the parties contest certain aspects of the United States Department of Commerce's ("Commerce" or "the Department") final results of the twelfth administrative review of the antidumping orders covering heavy forged hand tools ("HFHTs") from the People's Republic of China ("PRC") for the period of review ("POR") beginning February 1, 2002, and ending January 31, 2003.  *See* HFHTs, Finished or Unfinished, With or Without Handles, From the PRC, 69 Fed. Reg. 55,581 (ITA September 15, 2004) ("Final Results"), *as amended*, 69 Fed. Reg. 69,892 (December 1, 2004) ("Amended Final Results").

In addition, Ames challenges the liquidation instructions issued by Commerce to the United States Bureau of Customs and

---

[1]     This action includes court numbers 04-00460, 04-00526, 04-00644, and 04-00652.  *See* Order of 2/25/2005.

Border Protection ("Customs"). The court has jurisdiction over the antidumping determination pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(A)(i)(I), and over Ames' challenge to the liquidation instructions pursuant to 28 U.S.C. § 1581(i)(4). For the following reasons, Commerce's Final Results are sustained in part, and remanded in part.

BACKGROUND

In February 2003, in response to requests made by plaintiffs and Ames, Commerce initiated the twelfth administrative review of four antidumping duty orders originally published in 1991. *See* HFHTs, Finished or Unfinished, With or Without Handles, From the PRC, 68 Fed. Reg. 14,394, 14,395 (ITA Mar. 25, 2003). The subject orders applied to merchandise categorized as bars/wedges, picks/mattocks, hammers/sledges, and axes/adzes sold by nearly ninety producers. Commerce focused its review on exporters of the subject merchandise, which included Huarong (axes/adzes, bars/wedges), SMC (axes/adzes, bars/wedges, picks/mattocks, hammers/sledges), LMC (axes/adzes, bars/wedges), and TMC (bars/wedges, axes/adzes, hammers/sledges, picks/mattocks). The Final Results were published on September 15, 2004. After commencement of the present action, certain ministerial errors contained in the Final Results were raised and corrected through a voluntary remand and the Amended Final Results were published

on December 1, 2004.


     In the Final Results, Commerce applied adverse facts

available ("AFA") to plaintiffs' sales of subject merchandise on

an order-specific basis.  That is, "total" AFA[2] were applied to

———————————————————

     [2] Pursuant to 19 U.S.C. § 1677e(a), if:

          (1) necessary information is not available on
          the record, or

          (2) an interested party or any other person——

               (A) withholds information that has
               been requested by the administering
               authority or the Commission under
               this subtitle,

               (B) fails to provide such
               information by the deadlines for
               submission of the information or in
               the form and manner requested
               . . .,

               (C) significantly impedes a
               proceeding under this subtitle, or

               (D) provides such information but
               the information cannot be verified
               as provided in section 1677m(i) of
               this title,

     the administering authority and the Commission shall,
     subject to section 1677m(d) of this title, use the
     facts otherwise available in reaching the applicable
     determination under this subtitle.

19 U.S.C. § 1677e(a) (2000).

     If the agency finds the above criteria to be met, and makes
the separate subjective determination that the respondent has
"failed to cooperate by not acting to the best of its ability to
                                                  (continued...)

Huarong and LMC for their sales of merchandise within the scope

of the axes/adzes and bars/wedges orders, and to TMC for its

sales covered by the bars/wedges order.  *See* Final Results 69

Fed. Reg. at 55,583.  Partial AFA were applied to SMC's sales

under the bars/wedges order.  *See id*.  Commerce also kept in

place the antidumping orders against SMC's hammers and sledges

and LMC's bars and wedges.  *See id*. at 55,581; *see also* 19 C.F.R.

§ 351.222(d)(1) (2005).  Ultimately, the Department calculated

the country-wide antidumping duty rates ("PRC-wide") for HFHTs as

follows:  bars/wedges at 139.31%; picks/mattocks at 98.77%;

hammers/sledges at 27.71%; and axes/adzes at 55.74%.  *See id*. at

55,583.

## STANDARD OF REVIEW

When reviewing a final antidumping determination from

Commerce, the court "shall hold unlawful any determination,

---

[2](...continued)
comply with a request for information," then, under 19 U.S.C. §
1677e(b), the agency "may use an inference that is adverse to the
interests of that party in selecting from among the facts
otherwise available."  19 U.S.C. § 1677e(b).  Here, Commerce
applied what it refers to as "total adverse facts available."
While this phrase is not referenced in either the statute or the
agency's regulations, it can be understood within the context of
this case as referring to Commerce's application of adverse facts
available not only to the facts pertaining to specific sales for
which information was not provided, but to the facts respecting
all of respondents' sales encompassed by the relevant antidumping
duty order.  *See Gerber Food (Yunnan) Co., Ltd. v. United States*,
29 CIT __, __, 387 F. Supp. 2d 1270, 1285 n.3 (2005).

finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The existence of substantial evidence is determined "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'"  *Id*. (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).  "As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology."  *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404-05, 636 F. Supp. 961, 966 (1986), *aff'd*, 810 F.2d 1137, 1139 (Fed. Cir. 1987) (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc*., 467 U.S. 837, 843 (1984)); *see also Elkem Metals Co. v. United States*, 27 CIT __, __, 276 F. Supp. 2d 1296, 1301 (2003).

     With respect to Ames' challenge to Commerce's liquidation instructions, this Court applies the standard of review set forth in 5 U.S.C. § 706(2) (2000) of the Administrative Procedure Act ("APA") and will "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Consol. Bearings Co. v. United States*, 412 F.3d 1266, 1269 (Fed. Cir. 2005) (quoting 5 U.S.C. § 706(2); *Humane Soc'y of the United States v. Clinton*, 236 F.3d 1320, 1324 (Fed. Cir. 2001)) (internal quotation marks omitted). Section 706 of the APA authorizes the court to review the agency determination under three different standards: (1) arbitrary or capricious; (2) abuse of discretion; or (3) not in accordance with law. *See* 33 Charles Alan Wright & Charles H. Koch, Jr., *Federal Practice and Procedure: Judicial Review of Administrative Action* § 8334, at 167 n.2 (2006). "Under the 'arbitary and capricious' standard the scope of review is a narrow one." *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 442 (1974). "Applying this standard of review, an administrative action is to be upheld if the agency has 'considered the relevant factors and articulated a rational connection between the facts found and the choices made.'" *Humane Soc'y of the United States*, 236 F.3d at 1324–25 (quoting *Baltimore Gas & Elec. v. Natural Res. Def. Council, Inc.*, 462

U.S. 87, 105 (1983)).


DISCUSSION

I. Plaintiffs' Motion

A.    Application of Total AFA to Huarong's, LMC's, and
      Company A's Sales of Bars/Wedges: Principal/Agent
      Relationships[3]

Huarong, LMC, and Company A (collectively "the Companies")
contend that Commerce wrongfully applied total AFA to their sales
of bars and wedges based on its determination that they
misrepresented the nature of purported agency relationships.[4]  As
part of its findings, Commerce concluded that "nearly all of the
sales functions were conducted by the principal[s], and that the
agent[s'] participation was limited, for the most part, to
supplying invoices to the principal."  Issues and Decisions Mem.
for the Twelfth Admin. Rev. of the Antidumping Duty Orders on
HFHTs From the PRC ("Issues and Decisions Mem.") at 46.  Thus,
Commerce found that the purported agents were merely vehicles
employed by the principals to circumvent the payment of their

_____

      [3]    For purposes of confidentiality, when reference is made
to its specific relationship with Huarong, [[    ]] is referred
to as "Company A."  [[                                    ]] is
referred to as "Company B."  [[          ]] is not a party to the
instant action as the Final Results did not apply a rate to its
sales of subject merchandise.

      [4]    In particular, Commerce reviewed the relationships
between Huarong and [[    ]], and LMC and [[        ]].  *See*
Pls.' Mem. of Pts. and Auth. in Supp. of Mot. J. Agency R.
("Pls.' Mem.") at 16–23.

assigned antidumping duty rates.  *See* Def.'s Resp. to Mots. J.
Ag. R. ("Def.'s Resp.") at 9.  In Commerce's view, the Companies
significantly impeded the administrative review by "continually
misrepresent[ing] the true nature of their relationship with
their principal or agent during the [period of review]."  Issues
and Decisions Mem. at 46.

The Companies, on the other hand, argue for the legitimacy
of their agency relationships, and insist that an application of
AFA to their bars/wedges sales is not justified because they
"provided all the information requested by Commerce and
cooperated to the best of their ability in [their] efforts to
comply with Commerce's mandate."  Pls.' Mem. of Pts. and Auth. in
Supp. of Mot. J. Agency R. ("Pls.' Mem.") at 17.

In the Final Results, Commerce found the two claimed agency
relationships to be shams.  *See* Final Results 69 Fed. Reg. at
55,583 ("Huarong, LMC/LIMAC, and [Company A] participated in an
'agent' sales scheme whereby one PRC company allowed another PRC
company to enter subject merchandise under the first company's
invoices.").  In the first arrangement, Company A allegedly
served as Huarong's agent for its sales of bars and wedges in the
United States.  In the second, LMC acted as Company B's purported
agent for its U.S. bars and wedges sales.  The Companies argue

that neither relationship should serve as the basis for applying

AFA because: (1)(a) the Companies submitted to Commerce all of

the requested information as well as some additional documents

that were not part of Commerce's demand, and thus did not impede

Commerce's review and (b) that by doing so, they acted to the

best of their abilities to comply with Commerce's request; and

(2) despite Company A's and LMC's relatively minimal

responsibilities, they performed sufficient duties to qualify

both as actual agents.  *See* Pls.' Mem. at 17-19; 21-23.

As an example, in support of the first argument, Huarong

claims that:

> In its initial submission to Commerce, Huarong fully
> disclosed that it utilized an agent for a portion of
> its sales of subject merchandise bars/wedges.  It also
> included without request by Commerce a copy of the
> agent/principal contract entered into by Huarong and
> [Company A].  At no point did Huarong fail to provide
> information to Commerce or provide incorrect
> information.  In fact, in the next submission, Commerce
> asked again about agent sales, and requested that
> Huarong report all such "agent sales" as its own.
> Huarong complied by providing a sales flow diagram
> illustrating the agency relationship, and indicated
> that the agent sales had indeed been reported as sales
> by Huarong.

Pls.' Mem. at 18.

Regarding Commerce's finding that the limited business

activities actually undertaken by Company A and LMC prevented the

establishment of an agency relationship, the companies contend

that "it shows good business sense for the customer to have an
open relationship with the manufacturer, not just the agent, to
address [issues arising with the customer's order]."  Pls.' Mem.
at 19.[5]

These same arguments are made with respect to Commerce's
application of total AFA to Company A.  Company A, which
purportedly acted as Huarong's agent for sales of bars and wedges
to the United States, argues that it was equally cooperative as
Huarong and LMC in complying with Commerce's requests.  The
Companies, therefore, take the position that Commerce erred in
determining that they impeded the review, thereby justifying the
use of facts otherwise available pursuant to 19 U.S.C.
§ 1677e(a).  In addition, they dispute the finding that they
failed to act to the best of their abilities by participating in,
and then concealing, a fraudulent invoicing scheme, thereby
justifying the use of AFA pursuant to 19 U.S.C. § 1677e(b).

Commerce defends its application of total AFA to the
companies by stating that "'[r]enting' a dumping margin merits
the application of adverse facts available."  Def.'s Resp. at 9.

---

[5]        Specifically, the companies contend that "Commerce's
focus on what [Company A and LMC] [did] not do as . . . agent[s]
prevents it from seeing the contributions that [Company A and
LMC] provide[d] . . . ."  Pls.' Mem. at 18, 20.

Commerce maintains that the Companies were participants in an

invoicing scheme whereby the "principal" employed an "agent,"

which was subject to much lower duties than the principal, as a

tool to evade Commerce's orders.  Based on Huarong's submitted

responses regarding its relationship with Company A, Commerce

found that:

> The record shows that [Company A], whose cash deposit
> and assessment rates were lower than Huarong, sold
> blank invoices to Huarong, which then reported the
> entries as [Company A's] to Customs and benefitted from
> the very low rates applicable to [Company A].
> Likewise, the record shows that LMC and [Company A]
> sold their invoices to companies that reported their
> entries to Customs as made by LMC or [Company A], as
> appropriate, and, thus, benefitted from lower rates.
>
> In questionnaire responses, Huarong claimed that its
> relationship with [Company A] was a <u>bona</u> <u>fide</u> business
> arrangement whereby [Company A] acted as an agent for
> Huarong's sales of bars/wedges to one United States
> customer.  However, after two supplemental
> questionnaires, Huarong revealed that <u>Huarong</u> handled
> all of the negotiations and shipping arrangements for
> the sales in question. [Company A] received a fee for
> simply allowing Huarong to represent to Customs that
> the merchandise was [Company A] merchandise, rather
> than Huarong merchandise.

*Id*. at 9–10 (emphasis in original).  Commerce further found that

LMC provided similarly incomplete responses to the initial

section A questionnaire.

> After reviewing the record of this review, we find that
> [LMC] continually misrepresented the true nature of its
> relationship with [Company B] during the POR.  In its
> questionnaire responses, . . . [LMC] claimed that its
> relationship with [Company B] was a bona fide business
> arrangement whereby it acted as an agent for [Company
> B's] sales to one U.S. customer.  However, only by
> issuing three supplemental questionnaires to [LMC] did

the Department learn that [LMC] did not negotiate the terms of (i.e., the price and quantity), or arrange shipping for, the sales in question nor did it find new customers for [Company B].  Instead, [Company B] paid [LMC] to use its sales invoices to take advantage of [LMC's] lower cash deposit rate during the POR.  Absent our requests for additional information, the Department would not have discovered that [LMC] did not provide the services expected from a true "agent" . . . .

Adverse Facts Available Mem. LMC (A-570-803) (ITA Mar. 1, 2004) at 4-5; Def.'s Conf. App. Ex. 17.  The same finding was made with respect to Company A's submissions.  *See* Adverse Facts Available Mem. Company A (A-570-803) (ITA Mar. 1, 2004) at 4; Def.'s Conf. App. Ex. 15.  Thus, because, in Commerce's view, the Companies provided it with incomplete questionnaire responses concerning the responsibilities of the arrangement participants, the Department was justified in using facts otherwise available and AFA because they had "significantly impeded the proceedings and interfered with the assessment of accurate antidumping duties . . . [and] thus failed to cooperate to the best of their respective abilities."  Def.'s Resp. at 10.

The court concurs in Commerce's finding that the Companies initially failed to provide pertinent details concerning their invoicing arrangements.  In its review of the record, the court examined the Companies' initial questionnaire responses, which reveal that the purported agency relationships, while claimed as legitimate, were not fully explained.  *See generally* Huarong

Resp. to Questionnaire Sec. A (May 28, 2003); Company A Resp. to

Questionnaire Mini-Sec. A (Apr. 23, 2003); LMC Resp. to

Questionnaire Sec. A (May 28, 2003).  In addition, the

information contained in the responses to the supplemental

questionnaires demonstrated the true nature of the arrangements.

For instance, it was not until its September 3, 2003 response to

Commerce's supplemental section A questionnaire that Huarong

disclosed the details of the arrangement by stating that:

> Usually, the customer contacts Huarong, but places the order with [Company A].  The customer generally sends Huarong a fax copy of the order. . . .  The customer in the United States is a long-time customer and handles the orders as it chooses. . . .  For all agent sales, however, title to the goods passed from Huarong to the U.S. customer.  The agent did <u>not</u> take title. . . .
>
> Generally Huarong negotiated the price and quantity of the sale. . . .
>
> Generally Huarong confirmed the purchase order by telephone with the U.S. customer. . . .

Huarong Resp. to Supplemental Questionnaire Sec. A at 5-7 (Sept.

3, 2003) (emphasis in original).[6]  More specifically, Huarong

stated that "[Company A] issued the sales invoices."  *Id*. at 7.

In other words, the record shows that all of the sales activity

was performed by Huarong, that Company A received payment not for

carrying out duties tied to the sale of the merchandise, but for

---

[6]     Similar information was provided by LMC and [[    ]] in their responses to the supplemental questionnaires.  *See* LMC Resp. to Supplemental Questionnaire Sec. A at 5-8 (Sept. 29, 2003); *see also* [[    ]] Resp. to Supplemental Questionnaire Sec. A at 1-5 (Oct. 31, 2003).

merely providing the principal with blank invoices and packing lists, and that the true nature of the arrangement was not immediately revealed to Commerce.

Similarly, both LMC and Company A ultimately reported in their supplemental questionnaire response that, for "agent" sales: (1) the U.S. customer contacted the principal directly; (2) the principal negotiated the price, quantity, and shipping terms of the merchandise; (3) the principal made the sales calls; (4) the principal filled out the invoices and the purchase orders with the relevant sales data; (5) the principal paid the freight forwarder; and finally (6) that the "agents" issued the sales invoices.  *See* LMC Resp. to Supplemental Questionnaire Sec. A at 5-8 (Sept. 29, 2003); Company A Resp. to Supplemental Questionnaire Sec. A at 1-5 (Oct. 31, 2003).  Thus, it is apparent that both LMC and Company A were agents in name only as they were not burdened with any responsibilities concerning the sales other than providing their principals with invoices and packing lists.  As with Huarong, Commerce only learned these details after issuing supplemental questionnaires.

As a result of the inadequate answers found in the initial section A responses, Commerce was required to issue several supplemental questionnaires in order to get the necessary

information to complete its investigation.  Consequently, even though the Companies ultimately disclosed the circumstances surrounding their "agency" relationships, their failure to do so until after the issuance of several supplemental questionnaires surely significantly impeded Commerce's investigation by requiring the agency to prolong its review.  *See* 19 U.S.C. § 1677e(a); *see also Shandong Huarong Gen. Group Corp. v. United States*, 27 CIT __, __, slip op. 03-135 at 26 (Oct. 22, 2003) (not published in the Federal Supplement) (finding that respondents significantly impeded a review by submitting inaccurate questionnaire responses that precluded Commerce from conducting verification.).

Thus, the court's review of the record leads it to conclude that Commerce's use of facts otherwise available in determining the margins for the Companies' sales of bars and wedges was supported by substantial evidence and otherwise in accordance with the law under § 1677e(a).

Having found Commerce's use of facts otherwise available to be justified, the court now turns to the propriety of Commerce's application of total AFA to the Companies' sales of bars and wedges to the United States.  *See* 19 U.S.C. § 1677e(b).  If an interested party "fail[s] to cooperate by not acting to the best

of its ability to comply with a request for information,"
Commerce may then use an adverse inference when choosing from the
facts otherwise available.  19 U.S.C. § 1677e(b).[7]  Although the
statute does not provide a standard for what constitutes acting
to the best of a party's ability, the United States Court of
Appeals for the Federal Circuit has held that phrase to
"require[] the respondent to do the maximum it is able to do."
*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed.
Cir. 2003).  "When a respondent fails to respond to Commerce's
requests and the information it requested is material to the
investigation, this court previously has found such behavior to
be unreasonable and the use of AFA appropriate."  *Chia Far Indus.
Factory Co., Ltd. v. United States*, 28 CIT __, __, 343 F. Supp.
2d 1344, 1363 (2004).

In accordance with this standard, the court finds that the
Companies' failure initially to provide the relevant information
with respect to their invoicing arrangement, information that was
fully within their command, justified Commerce's application of
AFA to the Companies' sales of bars and wedges.

---

[7]     It is pertinent to note that, although § 1677e(a) and §
1677e(b) each require independent findings, "both standards are
met where a respondent purposefully withholds, and provides
misleading information."  *Shanghai Taoen Int'l Trading Co., Ltd.
v. United States*, 29 CIT __, __, 360 F. Supp. 2d 1339, 1345
(2005).

B.    Commerce's Application of Total AFA to Huarong's and
      TMC's Forged Tamper and Scraper Sales

Huarong and TMC next dispute Commerce's application of total

AFA to their sales of forged tampers and scrapers.  Commerce

states that, because Huarong and TMC failed to provide the

requested information, it was justified in using facts available.

*See* Issues and Decisions Mem. at 37; 19 U.S.C. § 1677e(a).

Commerce then applied AFA to Huraong and TMC based on its

conclusion that their actions demonstrated a failure to cooperate

by not acting to the best of their abilities to comply with its

request for information.  19 U.S.C. § 1677e(b); *see* Def.'s Resp.

at 13 (citing *Nippon Steel*, 337 F.3d at 1380).


Throughout the course of the twelfth review, Commerce asked

Huarong and TMC, as well as SMC, to provide information

concerning sales of tampers and scrapers.  *See* Issues and

Decisions Mem. at 37.  SMC "responded to the request by

explaining that they did not provide the information about the

sales data because they did not want to provide it while a scope

inquiry on the subject merchandise was still pending."  Pls.'

Mem. at 13.  As of the time of Commerce's request, the agency had

initiated formal scope inquiries as to tampers on August 4, 2003,

and for scrapers on December 2, 2003.  *See* Issues and Decisions

Mem. at 34.  The tampers inquiry terminated on July 29, 2004,

while the inquiry regarding scrapers remains open.

Huarong and TMC maintain that their failure to provide Commerce with the requested information was the result of a miscommunication.  Upon receiving Commerce's request for information relating to tampers and scrapers, SMC, apparently believing these tools were not covered by the order, notified Commerce that it would not provide the requested information because of the pending scope inquiry.  *See* Pls.' Mem. at 13. Huarong and TMC argue that, because Commerce never contested SMC's explanation as to why the company was not going to provide the requested information, they assumed that Commerce had waived its request for information on tampers and scrapers.  *Id*. Indeed, Huarong and TMC contend that:

> [They] did not purposefully try to evade Commerce's request for the sales data on scrapers and tampers. Rather, after Commerce failed to respond to SMC's explanation for its failure to supply the requested information, Huarong and TMC genuinely believed that the issue had been laid to rest.  Had Commerce again requested the information from Huarong and TMC, they would have provided [it].  This was merely a miscommunication among the parties, and Huarong and TMC should not receive AFA for a mistake.

Pls.' Mem. at 13.

In addition, Huarong and TMC argue that nothing required a response given the pending scope inquiry concerning the products subject to the request.[8]

---

[8]     Commerce ultimately did not apply AFA to SMC based on
(continued...)

Commerce first supports its application of total AFA to Huarong and TMC by maintaining that a pending scope determination does not cut-off a party's duty to respond to a request for information to the best of its ability. *See* Def.'s Resp. at 12–13; *see also* 19 C.F.R. § 351.225(l)(4) ("[N]otwithstanding the pendency of a scope inquiry, if the Secretary considers it appropriate, the Secretary may request information concerning the product that is the subject of the scope inquiry for purposes of a review under this subpart."). In addition, Commerce insists that "'intent' is not a necessary factor for the application of [AFA]." Def.'s Resp. at 12 (citing *Nippon Steel*, 337 F.3d at 1381).

Commerce's application of AFA to a respondent requires that agency to engage in the two-step analysis set forth in 19 U.S.C. §§ 1677e(a) and 1677e(b). With respect to a respondent's state of mind, the Federal Circuit has provided the following instruction:

> Under subsection (a), if a respondent "fails to provide [requested] information by the deadlines for submission," Commerce shall fill in the gaps with "facts otherwise available." The focus of subsection (a) is respondent's *failure to provide information*. The reason for the failure is of no moment. The mere

---

[8](...continued) its determination that the tampers sold by SMC were cast, and thus information on those tools was not required. *See* Issues and Decisions Mem. at 37, 38.

> failure of a respondent to furnish requested information–for any reason–requires Commerce to resort to other sources of information to complete the factual record on which it makes its determination.  As a separate matter, subsection (b) permits Commerce to "use an inference that is adverse to the interests of [a respondent] in selecting from among the facts otherwise available," only if Commerce makes the separate determination that the respondent "has failed to cooperate by not acting to the best of its ability to comply."  The focus of subsection (b) is respondent's *failure to cooperate to the best of its ability*, not its failure to provide requested information.

*Nippon Steel*, 337 F.3d at 1381 (quoting 19 U.S.C. § 1677e) (emphasis in original).  Thus, subsection (a) is triggered by a finding that a respondent has failed to provide requested information.  For a respondent to be subjected to the application of AFA under subsection (b), however, a more detailed analysis is required.

> Before making an adverse inference, Commerce must examine respondent's actions and assess the extent of respondent's abilities, efforts, and cooperation in responding to Commerce's requests for information.  Compliance with the "best of its ability" standard is determined by assessing whether respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation.  While the standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping. . . .

> To conclude that an importer has not cooperated to the best of its ability and to draw an adverse inference under section 1677e(b), Commerce need only make two showings.  First, it must make an objective showing that a reasonable and responsible importer would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations.  Second, Commerce must then

> make a subjective showing that the respondent under investigation not only has failed to promptly produce the requested information, but further that the failure to fully respond is the result of the respondent's lack of cooperation in either: (a) failing to keep and maintain all required records, or (b) failing to put forth its maximum efforts to investigate and obtain the requested information from its records.

*Id*. at 1382–83. (citations omitted); *see also Hebei Metals & Minerals Import & Export Corp. v. United States*, 29 CIT __, __, slip op. 05-126 at 6 (Sept. 22, 2005) (not published in the Federal Supplement).  Put another way, under the facts of this case, Commerce's use of an adverse inference cannot be based solely on a respondent's failure to submit requested information, but rather requires a demonstrated failure on behalf of the respondent to put forth its maximum efforts in attempting to provide Commerce with the requested data.

Here, the language of 19 C.F.R. § 351.225(l)(4) makes it clear that Commerce was entitled to seek the requested information regardless of the status of the scope inquiries, and that Huarong and TMC were required to respond.  The question is whether Huarong and TMC, having failed to respond, should be excused from answering the questionnaires based on SMC's representations to Commerce and the Department's subsequent silence.  The court finds that it is simply not the case that Huarong and TMC had reason to believe that Commerce's silence with respect to SMC's statements meant that they need not respond

to the agency's inquiries.  Each company was directly asked to
supply information.  Neither supplied the information nor did
either inquire on its own behalf whether the request had somehow
lapsed.  Considering the importance of the review process,
Commerce's failure to reply to SMC can provide no excuse for
either company's failure to supply the information.  Had the
respondents made inquiries of their own, the result might be
different, but having exerted no independent efforts to ascertain
the status of Commerce's request, they cannot now be heard as
having relied upon the unanswered statements of another.

Taking into account the failure of both Huarong and TMC to
provide Commerce with requested information, the court does not
find error in Commerce's decision to apply AFA to both companies'
sales of those products.  It is not clear to the court, however,
that Commerce properly extended its application of AFA to cover
Huarong's sales of all products covered by the axes/adzes and
bars/wedges orders, and TMC's sales of all products under the
bars/wedges order.  *See* Issues and Decisions Mem. at 38 ("[W]e
continue to apply total AFA to Huarong and TMC due to their
failure to provide the requested data for sales of forged tampers
and scrapers, respectively.").  Indeed, this Court has previously
found unreasonable the application of "total" AFA to a respondent
when Commerce had verified some, but not all of the respondent's

sales.  *See Goldlink Indus. Co., Ltd. v. United States*, 30 CIT __, __, slip op. 06-65 at 17–18 (May 4, 2006) (not published in the Federal Supplement) ("The Court, therefore, remands this issue back to Commerce to re-examine its determination to apply <u>total</u> adverse facts rather than partial adverse facts for the unverifiable sales.") (emphasis in original).  That is, Commerce generally may use an adverse inference only with respect to the specific information that a respondent failed to provide.  *See Shandong Huarong Gen. Group Corp.*, 27 CIT at __, slip op. 03-135 at 42 (holding that, "the findings that justified the use of facts available and a resort to adverse facts available with respect to [respondents'] sales data and factors of production, cannot be used to accord similar treatment to issues relating to [respondents'] evidence of independence from state control."); *see also Gerber Food (Yunnan) Co., Ltd. v. United States*, 29 CIT __, __, 387 F. Supp. 2d 1270, 1287 (2005).

Therefore, the court remands this matter for Commerce to explain why its determination that Huarong's and TMC's failure to report information on scrapers and tampers justified its apparent application of AFA to Huarong's total sales of merchandise covered by the bars/wedges and axes/adzes orders, and TMC's total sales covered by the bars/wedges order, and not just the merchandise for which requested information was not produced.

C.   139.31% AFA Rate Applicable to TMC's Exports of
     Bars/Wedges

In selecting the rate applicable to TMC's bars and wedges in this administrative review, Commerce chose the PRC-wide rate of 139.31% from the eighth administrative review.

TMC objects to the application of the rate for several reasons, among them is its claim that "the Department cannot select unreasonably high AFA rates that have no relationship to a respondent's actual dumping margin."  Issues and Decisions Mem. at 51.  For TMC, because it "fully disclosed every sale of subject merchandise during the POR . . . [,] the Department can calculate and assess dumping margins on all of the sales . . . ." *Id*.  In other words, TMC argues that the 139.31% rate is "unreasonably high and should be revised."  *Id*.

For its part, Commerce states that it chose the 139.31% rate because "other more recently calculated margins for bars/wedges do not offer an adequate incentive to induce TMC to cooperate in this proceeding, given that these rates are either less than, or nearly the same as, the cooperative rates calculated for TMC in the most recent reviews of its bars/wedges sales."  Issues and Decision Mem. at 42.

The court finds that Commerce has not justified its use of the 139.31% rate.  When making a determination with respect to the application of AFA, Commerce is required to read §§ 1677e(a) (directing the agency to "use the facts otherwise available" in reaching its determination when "necessary information is not available on the record . . .") and (b) (allowing the agency to "use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available") together.[9]  Indeed, Commerce may not use an adverse inference unless the use of facts otherwise available has resulted from a respondent's actions.  Only having found that the use of facts otherwise available is warranted may Commerce then determine that the party has "failed to cooperate by not acting to the best of

---

[9]     The current version of section 1677e is a result of the Uruguay Round Agreements Act of 1994, Pub. L. No. 103-465, 108 Stat. 4809 (1994).  In the Statement of Administrative Action, Congress explains that the Uruguay Round amended the prior law, which "mandate[d] use of the best information available (commonly referred to as BIA) if a person refuse[d] or [was] unable to produce information in a timely manner or in the form required." H.R. Doc. No. 103-316 (1994) at 868.  The new section 1677e "requires Commerce and the Commission to make determinations *on the basis of the facts available* . . . ." *Id*. at 869 (emphasis added).  Congress also states that "[w]here a party has not cooperated, Commerce . . . may employ adverse inferences about the *missing information* to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." *Id*. at 870 (emphasis added).  Thus, the legislative history of section 1677e(b), its plain language, and the holdings of this Court support a reading of the statute as permitting Commerce to use an adverse inference only in "selecting from among the facts otherwise available . . . ." *See Gerber*, 29 CIT at __, 387 F. Supp. 2d at 1288 (quoting 19 U.S.C. § 1677e(b)).

its ability to comply with a request for information . . . [and] use an inference that is adverse to the interests of that party in selecting *from among the facts otherwise available*." 19 U.S.C. § 1677e(b) (emphasis added). Section 1677e(b) further states that the "adverse inference may include reliance on information derived from . . . (1) the petition, (2) a final determination in the investigation under this subtitle, (3) any previous review under section 1675 of this title or determination under section 1675b of this title, or (4) any other information placed on the record." *Id*. Put another way, the statute can be reasonably understood as requiring the rate selected as AFA to be factually supported in all instances. As this Court has held,

> an assessment rate, standing alone, is not a "fact" or a set of "facts otherwise available," and under no reasonable construction of the provision could it be so interpreted. The statute does not permit Commerce to choose an antidumping duty assessment rate as an "adverse inference" without making factual findings, supported by substantial evidence . . . .

*Gerber Food (Yunnan) Co., Ltd.*, 29 CIT at __, 387 F. Supp. 2d at 1285. Moreover, Commerce must also impose an AFA rate that is a "reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance." *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1340 (Fed. Cir. 2002) (citations and internal quotation marks omitted).

Here, by merely selecting a rate from a previous review, Commerce has not provided the court with sufficient factual findings justifying its application of the 139.31% rate. In particular, the Department has failed to explain why the chosen rate represents a reasonably accurate estimate of TMC's actual rate to which it has added an amount to encourage TMC to cooperate in future proceedings. Thus, because Commerce cannot, absent adequate justification, select the highest available rate to apply as AFA, the court remands this issue to Commerce to afford it an opportunity to provide a factual basis for its selection of the 139.31% rate.

> D.    Application of Partial AFA to SMC's Sales of Bars and
>        Wedges For Failing to Report Finished Coating on Tool
>        Heads as a Factor of Production

In its Final Results, Commerce applied AFA to SMC's sales of bars and wedges based on its failure to provide data regarding certain factors of production for those tools. *See* Final Results 69 Fed. Reg. at 55,583. Specifically, Commerce cites SMC's responses to Section C and D of the questionnaire in which SMC indicated that the heads of those tools were coated with an "enamel, polyurethane, varnish or other finish (not including paint)."[10]  SMC Responses to Sections C and D of Questionnaire at

---

[10]    As Commerce noted, SMC's response to the Section C questionnaire indicated that a finished coating was applied to SMC's hammers/sledges, bars/wedges, and axes/adzes. Issues and
(continued...)

C-11, C-15, C-18 (Aug. 11, 2003).  Despite SMC's responses, it did not provide Commerce with any information as to the cost of the finish coating.  Based on SMC's failure to provide the requested finish coating cost information, Commerce used facts otherwise available to determine that cost.  *See* 19 U.S.C. § 1677e(a); *see also* Issues and Decisions Mem. at 16.  In addition, because it found that SMC failed to review the questionnaire response for accuracy prior to submission, Commerce determined that SMC failed to put forth its maximum efforts to provide Commerce with requested information and used an adverse inference in selecting from among the facts otherwise available.  *See* 19 U.S.C. § 1677e(b); *see also* Issues and Decisions Mem. at 16.  As a result, Commerce used the highest ratios of finished coating weight to steel input weight based on the data received from TMC in this investigation to calculate the normal value of SMC's bars and wedges.  *See* Issues and Decisions Mem. at 16.[11]

---

[10](...continued)
Decision Mem. at 16.  The Section D questionnaire, however, indicated only that SMC applied a finished coating to its hammers/sledges.  *Id*.

[11]     According to Commerce:

[W]e divided the weight of the finish coating reported by TMC's supplier for bars/wedges by the steel input weight for TMC's bars/wedges. We applied the highest of these ratios to the steel input weight for bars/wedges reported by SMC's supplier of bars/wedges.  As partial AFA, we then included this weight as the

(continued...)

SMC insists that its questionnaire responses were induced by "Commerce's 'introduction of a new system for reporting CONNUMs that was started for the first time in this administrative review.'"[12]  Pls.' Mem. at 26 (quoting Issues and Decision Mem. at 15).  According to SMC, it never meant to inform Commerce that a finish coating other than standard paint was applied to the bars/wedges and it did not report the factor of production information because, in its view, there was none to report.  *See id.* at 26.

Commerce maintains that the format of its questionnaire was in no way confusing.  *See* Def.'s Resp. at 14, 15 ("[T]he questionnaire issued in this review was unambiguous.").  It notes that the questionnaire specifically asked the respondents, in one field, to indicate whether the tool heads were painted, and in a separate field to report whether the tool heads were coated with "an enamel, polyurethane, varnish or other finish" other than

---

[11](...continued)
    consumption rate for finish coating [in] our
    calculation of [normal value] for SMC's
    bars/wedges.

Issues and Decisions Mem. at 16.

[12]     "Control numbers, or CONNUMs are used by Commerce to designate merchandise that is deemed identical based on the Department's model matching criteria. . . .  CONNUMs are used as the basis for product identification in most cases."  *Koenig & Bauer-Albert AG v. United States*, 24 CIT 157, 161 n.6, 90 F. Supp. 2d 1284, 1288 n.6 (2000).

ordinary paint.  SMC Responses to Section C and D of
Questionnaire at C-11, C-15, C-18.  Commerce further supports its
application of partial AFA to SMC by citing *Nippon Steel* for the
proposition that the standard for using AFA "does not condone
inattentiveness, carelessness, or inadequate record keeping."
*Nippon Steel*, 337 F.3d at 1382.  Moreover, Commerce contends
that, if SMC found the questionnaire to be confusing, it should
have made that known to the Department prior to submitting its
answers.  *See* Def.'s Resp. at 15.

The court finds SMC's arguments unpersuasive.  Upon review
of the subject questionnaire, it is difficult to find any
ambiguity in Commerce's request for information regarding the
finish, if any, applied to the tools.  The questionnaire asked in
Field Number 3.10, which is entitled "Paint," whether the
"bar/wedge is painted or not painted," and instructed the
respondent to place a "1" in the response if the tool was
painted, and a "2" in the event that no paint was applied.  SMC's
Responses to Sections C and D of Questionnaire at C-15.  Directly
below Field Number 3.10 is Field Number 3.11, which is entitled
"Finish Coating."  This category directed respondent to indicate
whether the "[bar/wedge] head is coated with an enamel,
polyurethane, varnish or other finish (*not including paint*)."
*Id*. at C-16 (emphasis added).  As with the paint inquiry,

respondents were instructed to place a "1" in the response if their tools were finish coated and a "2" if no such coating was applied. With respect to its bars/wedges, SMC placed a "1" in both the Paint and Finish Coating columns, indicating that the tool heads were both painted and coated with some other finish. *See* Pls.' Conf. Appx., SMC's Responses to Sections C and D of Questionnaire. Therefore, the court agrees that the failure of SMC to report the costs associated with the requested finish coating factor of production warranted the use of facts otherwise available under § 1677e(a) because, having failed to provide Commerce with data relating to one of SMC's questionnaire responses, SMC prevented Commerce from calculating normal value based on a complete factual record, and thus impeded the investigation.

"Compliance with the 'best of its ability' standard [for the use of AFA] is determined by assessing whether respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel*, 337 F.3d at 1382. Because it "withh[eld] information that [had] been requested by the administering authority . . . ," and failed to recognize, prior to submitting its response, that it had done so, SMC failed to put forth its maximum efforts to provide Commerce with the requested cost data for the finish

coating.  19 U.S.C. § 1677e.  In addition, Commerce limited its

application of AFA to the specific area of SMC's failure, i.e.,

the cost of the finish coating.  This being the case, the court

affirms Commerce's determination.

E.    Commerce's Decision Not to Revoke the Antidumping Duty
      Order Applicable to SMC and LMC

Finally, SMC and LMC contest Commerce's denial of their

requests to have the antidumping duty orders applicable to their

respective sales of hammers/sledges and bars/wedges revoked.  *See*

Final Results 69 Fed. Reg. at 55,582; *see also* Issues and

Decision Mem. at 19-20, 26-27.

1.    SMC's Request to Revoke Antidumping Order Covering
      Hammers/Sledges: Commercial Quantities

Commerce's regulations provide that "before revoking an

order . . . the Secretary must be satisfied that, during each of

the three . . . years, there were exports to the United States in

commercial quantities of the subject merchandise to which a

revocation . . . will apply."  19 C.F.R. § 351.222(d)(1).[13]  At

_____

[13]     This requirement fits directly within the regulatory
burden placed on the requesting party to submit with its request:

   (i) The person's certification that the person sold the
   subject merchandise at not less than normal value during the
   period of review . . . and that in the future the person
   will not sell the merchandise at less than fair value;

   (ii) The person's certification that, during each of
   the [three] consecutive years . . . the person sold the
                                                   (continued...)

issue in the instant action is Commerce's finding that the antidumping duty order should remain in effect because SMC did not export its hammers and sledges to the United States in commercial quantities for three consecutive years. Neither the statute nor the regulations provide a definition of "commercial quantities." *See* Pls.' Mem. at 28; *see also* Def.'s Resp. at 22.

SMC maintains that it complied with the regulations by participating meaningfully in the U.S. market. *See* Pls.' Mem. at 28. According to SMC, its exports significantly increased over the three-year period encompassing 2000-2001, 2001-2002, and 2002-2003.[14] While the parties agree that the total number of pieces exported during the 2001–2002 and 2002–2003 periods constituted commercial quantities, Commerce found that the hammer/sledge exports during 2000–2001 failed to meet the regulatory standard. *See* Pls.' Mem. at 28; *see also* Def.'s Resp.

---

[13](...continued)
subject merchandise to the United States in commercial quantities; and

(iii) If applicable, the agreement regarding reinstatement in the order . . . .

19 C.F.R. § 351.222(e)(1).

[14]    For the period covering 2000-2001, SMC exported [[ ]] pieces. In 2001-2002, the exports from the Jinma factory totaled [[        ]]. In the 2002-2003 period, SMC exported [[ ]] hammers/sledges produced at the Jinma location. Pls.' Mem. at 28-29.

at 22-23.  Although the levels attained in the subsequent two
years were greater, SMC argues that the number of hammers/sledges
exported to the United States during 2000-2001 satisfied the
regulatory requirement of exporting subject merchandise in
commercial quantities.  Indeed, SMC emphasizes that, during the
tenth administrative review, which covered 2000-2001, Commerce
made no mention of any failure on SMC's part to sell the subject
merchandise in commercial quantities and gave SMC a zero percent
margin for its hammers/sledges exports.  *See* Pls.' Mem. at 28;
*see also* HFHTs From the PRC, 67 Fed. Reg. 57,789, 57,792 (Sept.
12, 2002) ("tenth review").  Because Commerce did not, at the
time of the tenth review, question whether the subject
merchandise was exported in commercial quantities, SMC insists
that Commerce is prohibited from doing so now.  *See* Pls.' Mem. at
29.

Commerce acknowledges that neither the statute nor the
regulations provide guidance with respect to the definition of
commercial quantities.  *See* Def.'s Resp. at 22.  For Commerce,
the absence of any formal standard requires commercial quantities
to be determined on a "case-by-case basis, based on the unique
facts of each proceeding."  *Id*.  Commerce explains that its
current practice is to "compare[] the quantity of exports in each
period of review to an appropriate benchmark period and also

consider[] sales in absolute terms, examining whether the quantity in any of the periods was abnormally small." *Id*. (internal quotation marks omitted).  In reaching its conclusion in the instant matter, Commerce asserts that it adhered to this practice and used the export levels for 2002-2003 as the benchmark period.  *See* Def.'s Resp. at 22.  In other words, Commerce compared the volume of exports by SMC to the United States from 2000-2001 and 2001-2002 to the volume exported in 2002-2003.  In comparing the exports from 2000-2001 to the benchmark period of 2002-2003, Commerce found the former figures to be "dwarfed" by the latter and, thus, insufficient to support a finding that the order was no longer necessary to prevent dumping.  *Id*.

Next, Commerce asserts that the absence of a discussion within the tenth review concerning whether SMC exported hammers/sledges in commercial quantities was to be expected. Commerce is correct.  As Commerce notes, "[t]he yearly review procedures do not require a 'commercial quantities' analysis." *Id*. at 24.  Commerce argues that neither the fact that SMC's exports were not discussed in terms of commercial quantities in the tenth review, nor the assignment of a zero margin supports a finding that SMC complied with 19 C.F.R. § 351.222(e).  This is because whether a respondent exported the subject merchandise in

commercial quantities is not a factor that Commerce considers when assigning dumping margins. *See*, *e.g.*, 19 C.F.R. § 351.213 (articulating the factors and procedures to be applied in an administrative review. Notably absent from this list is a requirement that the subject merchandise be exported in commercial quantities.).

"When a particular term is not expressly defined in a statute, the meaning of that term may be discerned by looking to the provisions of the whole law, and to its object and policy." *Cal. Indus. Prods., Inc. v. United States*, 436 F.3d 1341, 1353 (Fed. Cir. 2006) (internal citations, alterations and quotation marks omitted). Commerce claims that it has satisfied the requirement of *California Products, Inc.* because its benchmark methodology is a "current practice" aimed at discerning meaning for the phrase "commercial quantities" under 19 C.F.R. § 351.222(e)(1). *See* Def.'s Resp. at 22.[15] Using SMC's exports from 2002–2003 as the benchmark, Commerce found that the volume in 2000–2001 was "abnormally small" in comparison, and, thus, did

---

[15]    In support of its assertion that the benchmark methodology is a "current practice," Commerce cites Determination Not To Revoke the Antidumping Duty Order: Brass Sheet and Strip From the Netherlands, 65 Fed. Reg. 742, 750 (Jan. 6, 2000), and Pure Magnesium From Canada: Final Results of Antidumping Duty Administrative Review and Determination Not To Revoke Order in Part, 64 Fed. Reg. 12,977, 12,979 (Mar. 16, 1999). *See* Def.'s Resp. at 22.

not amount to "commercial quantities." *Id*.  What Commerce does

not explain is why its current practice fulfills the purpose of

the regulation, which is to ensure that an exporter will continue

to participate in fair trade practices upon revocation.[16]  *See*

Rules and Regulations, Antidumping Duties; Countervailing Duties

("Preamble"), 62 Fed. Reg. 27,296, 27,325–26 (ITA May 19, 1997).

Indeed, Commerce retained the "commercial quantities" language in

the regulation even after the requisite notice and comment period

produced some remarks suggesting that the phrase was not needed.

Specifically, Commerce stated that:

> [W]e believe that it is reasonable to presume that if
> subject merchandise, shipped in commercial quantities,
> is being dumped or subsidized, domestic interested
> parties will react by requesting an administrative
> review to ensure that duties are assessed and that cash
> deposit rates are revised upward from zero.  If
> domestic interested parties do not request a review,
> presumably it is because they acknowledge that the
> subject merchandise continues to be fairly traded.

---

[16]     The Preamble of 19 C.F.R. § 351.222 explains why
Commerce believes an exporter must demonstrate that it had
shipped the subject merchandise in "commercial quantities" for a
three-year period.  For Commerce:

> The underlying assumption behind a revocation
> based on the absence of dumping or
> countervailable subsidization is that a
> respondent, by engaging in fair trade for a
> specified period of time, has demonstrated
> that it will not resume its unfair trade
> practice following the revocation of an
> order.

Rules and Regulations, Antidumping Duties; Countervailing Duties
62 Fed. Reg. at 27,326.

>     However, neither presumption can be made when
>     merchandise is not being shipped in commercial
>     quantities.

Preamble at 27,326; *see also* Pure Magnesium From Canada: Final

Results of Antidumping Duty Administrative Review and

Determination Not To Revoke Order in Part, 64 Fed. Reg. 12,977,

12,979 (Mar. 16, 1999) ("This requirement ensures that the

Department's revocation determination is based upon a sufficient

breadth of information regarding a company's normal commercial

practice.").


Without further explanation, however, it is difficult to see

how the current "benchmark" methodology employed by Commerce

would further the purpose of the regulation.  That is, why is

Commerce's method a reasonable way to ensure the regulation's

goals.  For that reason, the court remands this issue in order to

allow Commerce to provide the court with an explanation as to how

its methodology results in a reasonable measure of "commercial

quantities."  That is, Commerce must explain: (1) how it arrived

at the "benchmark period"; (2) why it was reasonable in its

selection; and (3) how a comparison of the two periods

demonstrates that the exports for the year 2000-2001 do not

constitute commercial quantities.

        2.    LMC's Request to Revoke Antidumping Duty Order
              Covering Bars/Wedges: Sale of Merchandise at Not
              Less Than Normal Value

Commerce also denied LMC's request to have the antidumping duty order applicable to its sales of bars/wedges revoked, basing its denial on LMC's failure to sell its merchandise at not less than normal value[17] for three consecutive years. *See* 19 C.F.R. § 351.222(e)(1)(i).[18]  Commerce's conclusion was based on its application of AFA to LMC's sales of bars and wedges for its failure to participate to the best of its ability to provide information on its invoicing practices, and LMC's consequent receipt of an above *de minimis* dumping margin for the period of review.  *See* Def.'s Resp. at 25.  Because of the imposition of a more than *de minimis* margin, Commerce found that LMC was

---

[17]    Normal value of the subject merchandise is defined as

> the price at which the foreign like product
> is first sold (or, in the absence of a sale,
> offered for a sale) for consumption in the
> exporting country, in the usual commercial
> quantities and in the ordinary course of
> trade and, to the extent practicable, at the
> same level of trade as the export price or
> constructed export price . . . .

19 U.S.C. § 1677b(a)(1)(B)(i).

[18]    This regulation provides in pertinent part that, along with a written request to revoke, a person must submit: "(i) The person's certification that the person sold the subject merchandise at not less than normal value during the period of review . . . and that in the future the person will not sell the merchandise at less than normal value . . . ."  19 C.F.R. § 351.222(e)(1)(i).

necessarily selling its merchandise at less than normal value.
*See* Def.'s Resp. at 25.  LMC contends that the margin was
assigned as a result of the Department's erroneous application of
AFA to its bars/wedges sales.  *See* Pls.' Mem. at 31.  For LMC,
the decision not to revoke the order covering its bars and wedges
cannot be based on an unlawfully assigned margin.  Commerce
argues that both its application of AFA to LMC and its subsequent
assignment of an above *de minimis* margin were appropriate, and
that therefore its decision not to revoke the order was supported
by substantial evidence and otherwise in accordance with law.

Having previously found Commerce's application of AFA to
LMC's sales of bars/wedges to be supported by substantial
evidence, the court finds that the resulting margin and,
consequently, Commerce's decision not to revoke based on LMC's
failure to meet the regulatory requirements of 19 C.F.R. §
351.222(e)(1)(i) are supported by the same.  Thus, Commerce's
decision not to revoke the antidumping duty order covering LMC's
sales included within the scope of the bars/wedges order is
sustained.

II.  Ames' Motion

    A.   Commerce's Use of Steel Billet Instead of Hexagonal
         Steel Bar as a Surrogate Value for TMC

    Ames first challenges Commerce's use of a surrogate value

for steel billet when calculating the normal value of certain of

TMC's merchandise.  Under 19 U.S.C. § 1677b(c), when the subject

merchandise is exported from a nonmarket economy country

("NME"),[19] normal value may be calculated by valuing the factors

of production in a market economy country or countries considered

to be appropriate by Commerce.  *See* 19 U.S.C. § 1677b(c)(1).  As

TMC's merchandise is exported from China, a NME, Commerce used

this methodology to determine normal value for TMC's bars/wedges,

axes/adzes, and hammers/sledges.  *See* Issues and Decision Mem. at

5-7.  Ames does not argue with this methodology, but rather

disputes Commerce's decision to use steel billet instead of

hexagonal steel bar when valuing this input.  *See* Def.-Int.'s Br.

Supp. Mot. J. Agency R. ("Def.-Int.'s Br.") at 8.


In support of its contention that Commerce valued the wrong

kind of steel, Ames points to TMC's product catalog, which

describes certain tools as made from hexangular stock.  *See id*.

According to Ames, the conversion of steel billet into a

hexagonal shape requires equipment that has not been shown to be

---

[19]    A "nonmarket economy country" is "any foreign country
that the administering authority determines does not operate on
market principles of cost or pricing structures, so that sales of
merchandise in such country do not reflect the fair value of the
merchandise."  19 U.S.C. § 1677(18)(A).  "Any determination that
a foreign country is a nonmarket economy country shall remain in
effect until revoked by the administering authority."  19 U.S.C.
§ 1677(18)(C).

in TMC's possession.  *See id*. at 9.


     Commerce claims that, although TMC did have descriptive
language in its catalog indicating the use of hexagonal steel
bar, this observation alone is not dispositive.  *See* Def.'s Resp.
at 25.  Rather, Commerce relies on the record invoices from TMC's
suppliers, which demonstrate that TMC bought substantial
quantities of steel billet and scrap rail but no hexagonal stock.
*See id*. at 25-26; *see also* Issues and Decision Mem. at 7.  Thus,
the Department based its determination on data that "dealt
specifically with the inputs used and were linked to the raw
material inventory . . . ."  Def.'s Resp. at 25.  Commerce
concludes that the "ambiguous statement [contained in the
catalog] does not overcome the documentary evidence supplied by
TMC's suppliers regarding the material inputs they used to
produce HFHTs."  Issues and Decision Mem. at 7.


     As to Ames' argument that TMC does not have the equipment to
transform billet into hexagonal bars, Commerce notes that,
"[g]iven that the forging process heats the steel input to a
degree such that the input can be shaped into the desired form,"
no practical barrier exists to prevent the billet from being
shaped into hexagonal bar.  *Id*.  Thus, Commerce contends that the
fact that TMC does not have access to a rolling mill or other

such machinery does not foreclose a finding that TMC could convert steel billet into hexagonal stock.

Here, Commerce's decision is supported by its review of what TMC actually purchased from its raw material suppliers. That is, Commerce "examined the invoices, which dealt specifically with the inputs used and were linked with the raw material inventory, rather than a general reference in a brochure." Def.'s Resp. at 25; *see also* Def. Conf. R. Ex. 14 (consisting of TMC's Response to Section D of Questionnaire (November 3, 2003)).[20] Commerce also took into account that the process TMC was known from record evidence to have used, could produce hexagonal shapes. Ames' argument, on the other hand, is largely based on conjecture.

Thus, the court finds that Commerce has supported its finding with substantial evidence and sustains its conclusion.

---

[20] In response to question twenty of Section D of the questionnaire, which sought a list of all types of steel used to produce the subject merchandise, TMC submitted invoices from suppliers indicating that either scrap rail or steel billet was purchased from [[      ]], [[      ]], [[      ]], [[      ]], and [[      ]]. *See* Def. Conf. R. Ex. 14. The invoices provide both the type and amount of steel purchased as well as the tool for which the steel was intended to be used. *Id.*

B.   Commerce's Failure to Apply AFA to TMC's Sales of
     Axes/Adzes and Picks/Mattocks Supplied by Company C[21]

Ames' next contention is that Commerce erred in not applying

AFA to TMC's sales of axes/adzes and picks/mattocks supplied by

Company C.  Ames argues that because Commerce applied AFA to SMC

for failing to report data that Company C would not provide, it

should also apply AFA to TMC even though Company C *did* cooperate

by supplying TMC with requested information.  Ames contends that

Commerce's past practice dictates that AFA be applied to both

respondents based on Company C's status as an interested party.

*See* Def.-Int.'s Br. at 12.  Commerce maintains that applying AFA

to TMC, which participated to the best of its ability in this

portion of the review, would be contrary to public policy.  *See*

Def. Resp. at 19; Issues and Decisions Mem. at 30.


Ames' argument is rooted in its analyses of two prior

Commerce determinations: Fresh Garlic From the PRC, 68 Fed. Reg.

75,210 (Dec. 30, 2003) ("Fresh Garlic"); and Tapered Roller

Bearings and Parts Thereof, Finished and Unfinished, From the PRC

(final results), 62 Fed. Reg. 61,276 (Nov. 17, 1997) ("Tapered

Roller Bearings 1995-1996").  According to Ames, these

determinations bind Commerce to apply AFA to all respondents

associated with an uncooperative interested-party supplier,

---

[21]    For purposes of confidentiality, [[        ]] is
referred to as "Company C."  *See* Def.-Int.'s Br. at 11.

regardless of whether a respondent cooperated or whether the

interested-party supplier cooperated with that respondent.  *See*

Def.-Int.'s Br. at 12-13.  Indeed, Ames insists that:

> [A] supplying producer is an interested party whose
> failure to cooperate is attributable to the exporting
> respondent. . . . [A]s long as one respondent received
> [AFA] for its response for this reason, any other
> respondent that also sold subject merchandise to the
> United States manufactured by that respondent should
> also receive [AFA].

*Id*. at 12.

Central to Ames' argument is its contention that Company C

is an interested party under § 1677(9).[22]  *Id*. at 13.  Ames

contends that, had Commerce found Company C to be an interested

party, its lack of cooperation with respect to SMC would be

properly attributable to both SMC and TMC.  *Id*.

In Commerce's view, its decision to refrain from applying

AFA to TMC was proper because, unlike SMC, TMC fully complied

with Commerce's requests.  *See* Def.'s Resp. at 19–20.  Commerce

further insists that applying AFA to TMC in this instance would

be contrary to the purpose behind AFA, which is to encourage

---

[22]     Section 1677(9) provides, in pertinent part that "[t]he
term 'interested party' means . . . (A) a foreign manufacturer,
producer, or exporter, or the United States importer, of subject
merchandise or a trade or business association a majority of the
members of which are producers, exporters, or importers of such
merchandise . . . ."  19 U.S.C. § 1677(9)(A).

respondents to fully participate in administrative reviews. *See id*. at 19. For Commerce, because "[t]he purpose of the 'adverse inference' is to encourage participation, [it] properly concluded that applying an 'adverse inference' to TMC, notwithstanding its cooperation, would be contrary to that purpose." *Id*. Therefore, because TMC cooperated to the best of its ability *and persuaded Company C to do the same*, Commerce maintains that its decision to not apply AFA to TMC was reasonable.

The court agrees with Ames that Company C, as a foreign manufacturer of the subject merchandise, is an interested party under § 1677(9)(A) (including within the ambit of "interested party" a "foreign manufacturer, producer, or exporter . . . of subject merchandise . . . ."). Nonetheless, while acknowledging that Commerce has previously applied AFA to respondents whose interested-party suppliers failed to provide relevant factors of production data, *see* Fresh Garlic at 75,210; *see also* Tapered Roller Bearings 1995–1996 at 61,276, the court finds that Commerce correctly determined that the situation presented here is distinct from that in those past investigations.[23] An

---

[23]     It is apparent that these two prior determinations are not enough to constitute an agency practice that is binding on Commerce. *See Ranchers-Cattlemen Action Legal Foundation v. United States*, 23 CIT 861, 884–85, 74 F. Supp. 2d 1353, 1374 (1999) ("An action . . . becomes an 'agency practice' when a uniform and established procedure exists that would lead a party,
(continued...)

examination of the facts in those two investigations demonstrates that, in Fresh Garlic, the supplier data was rejected as untimely, and in Tapered Roller Bearings 1995-1996, the respondent never actually produced any of the requested information. Thus, although these respondents made efforts to get interested parties to give them the information needed to be responsive, ultimately, they failed to obtain the information in a timely fashion or were unable to obtain the information at all. Unlike the respondents in the investigations cited by Ames, TMC was able to comply with Commerce's request because it successfully convinced Company C to provide it with the necessary data. Commerce's choice to recognize this cooperation by not applying AFA was reasonable because TMC, by its cooperation and timely production of information, did nothing that would trigger the use of either facts otherwise available or AFA. *See* 19 U.S.C. § 1677e.


C.   Propriety of PRC-Wide Rate Applicable to Huarong's Scraper Sales

Ames next objects to Commerce's application of the PRC-wide 55.74% rate to Huarong's sales of scrapers because, in its view, that rate is sufficiently low that Huarong would actually benefit

---

[23](...continued)
in the absence of notification of change, reasonably to expect adherence to the established practice or procedure.").

from it.  *See* Def.-Int.'s Br. at 16.  Commerce applied the PRC-

wide rate as a result of Huarong's previously discussed failure

to report factors of production data concerning its forged

scrapers.  *See id.*  While Huarong challenges Commerce's decision

to apply AFA to its forged scrapers sales, it does not take issue

with the calculation of the rate.  *See* Pls.' Mem. at 12–13.

Because Ames believes that the 55.74% rate is insufficient to

encourage cooperation, it urges the court to direct Commerce to

calculate a rate using information from Huarong's questionnaire

responses.  *See* Def.-Int.'s Br. at 16.


As part of its argument, Ames states that, during the

investigation, it calculated a rate based on data submitted by

Huarong and urged its use by Commerce.[24]  Ames claims that

Commerce failed sufficiently to take into account this proposed

--------

[24]     Specifically, Ames proposed a rate to Commerce that it
claims accounted for:

> (1) the omission of an amount for foreign
> inland freight for the steel input from the
> calculation of [normal value]; (2) the
> omission of an amount for foreign brokerage
> and handling from the calculation of net
> export price; and (3) the inclusion of
> Huarong's reported scrap offset in the
> calculation of [normal value].  Using these
> assumptions and the actual data provided by
> Huarong, Ames calculated a dumping margin of
> [[                    ]].

Def.-Int.'s Br. at 16–17.

rate and thus acted in violation of 19 C.F.R. § 351.309(b)(1).
("In making the final determination in a[n] . . . antidumping
investigation . . ., the Secretary will consider written
arguments in case or rebuttal briefs filed within the time limits
in this section."). Notably, this rate was dramatically greater
than the PRC-wide rate. *Id*. at 20.[25] Because it submitted its
proposed rate in writing, Ames contends that Commerce was
required by regulation to consider its claim that Huarong was
benefitting from the application of the PRC-wide rate. *See id*.
at 17.

In response to an argument made by Commerce, Ames takes
issue with the Department's finding that the data Huarong
reported was incomplete and, thus, could not be used to calculate
an accurate antidumping duty rate. Ames insists that, despite
Huarong's failure to respond to supplemental questionnaires, the
information contained in Huarong's initial response was
sufficiently complete to support an individual rate calculation.
*Id*. at 18. In addition, Ames asserts that, once the decision is
made to apply AFA, Commerce is no longer burdened by the
responsibility of calculating dumping margins as accurately as
possible. *Id*.

---

[25] Indeed, the rate was [[          ]] the PRC-wide rate
of 55.74%. *Id*. at 20.

In response, Commerce first notes that it did consider the rate calculated by Ames but found the data used in its calculation wanting.  *See* Def.'s Resp. at 16; *see also* Issues and Decisions Mem. at 18 ("Relying upon incomplete sales and [factors of production] data . . . would be contrary to our responsibility to calculate accurate dumping margins. . . .  We consider the application of the AFA rate more appropriate than calculating a margin based on incomplete and unverified sales and [factors of production] data.").  In other words, because "Huarong refused to answer supplemental questions on scrapers, [which] ruled out the possibility of any verification . . .," Commerce concluded that the data contained in Huarong's initial response was insufficient to make an accurate calculation.  Issues and Decisions Mem. at 18.  Next, Commerce points out that in the ninth administrative review, the most recent review in which an AFA rate was applied to Huarong's sales of scrapers, the rate was 18.72%.  *See* HFHTs From the PRC, 66 Fed. Reg. 48,026, 48,029 (ITA Sept. 17, 2001) (final results) ("ninth review"); *see also* Def.'s Resp. at 16.  For the instant review, Commerce emphasizes that "the rate selected as adverse facts available was 55.74 percent . . .[,]" which is nearly three times as high as the most recently applied rate.  Def.'s Resp. at 16.  That is, Commerce believes that an approximate 300% rate increase would provide a sufficient incentive to encourage cooperation in future reviews.

The court agrees with Commerce's conclusion that the PRC-wide rate is adequate to encourage participation in future reviews. First, the court notes that, despite Ames' assertion to the contrary, "[i]t is clear . . . that [Congress] intended for an adverse facts available rate to be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance." *Ta Chen Stainless Steel Pipe, Inc.*, 298 F.3d at 1340 (citation and internal quotation marks omitted). In addition, the court cannot conclude that the factors of production data provided in Huarong's original response provided a sufficient basis upon which Commerce could select an appropriate AFA rate. By failing to submit answers to Commerce's supplemental questionnaires, Huarong effectively prohibited the agency from verifying the data contained in the initial response. While "verification is a spot check and is not intended to be an exhaustive examination of the respondent's business," it does allow Commerce to ensure the validity of the submitted data, which, in turn, leads to more accurate rate calculations. *Torrington Co. v. United States*, 25 CIT 395, 444, 146 F. Supp. 2d 845, 897 (2001). Put another way, because the information contained in Huarong's first response was incomplete and incapable of being verified, Commerce reasonably determined that the response was insufficient to support the calculation of an AFA rate. Second, it is apparent that Commerce

indeed considered Ames' written argument in compliance with its
regulations, but simply found Ames' calculated rate to be
lacking.  Finally, the court cannot find that the assigned rate
will not be adequate to encourage future cooperation.  The
incentive to cooperate is found by the addition of "some built-in
increase intended as a deterrent to non-compliance," to a
reasonable estimate of the actual rate.  *Ta Chen Stainless Steel
Pipe, Inc.*, 298 F.3d at 1340 (internal quotation marks omitted).
Ames' rate, because it is based on unreliable data, fails to
provide a reasonable estimate of what the rate should be.  In
addition, the magnitude of Ames' rate suggests that its purpose
is to be punitive rather than merely to encourage cooperation.
*See id.*  Thus, the court affirms Commerce's application of the
55.74% PRC-wide rate to Huarong as supported by substantial
evidence and otherwise in accordance with law.


       D.    Huarong's and SMC's Failure to Report Data on Cast
             Tamper Sales: Application of AFA

     Ames' next claim is that Commerce erred in not applying AFA
to Huarong and SMC for their failure to report sales information
concerning *cast* tampers.  *See* Def.-Int.'s Br. at 20.  As has been
previously discussed, Commerce applied AFA to Huarong for its
failure to report on its sales of *forged* tampers.  *See supra* Part
I. B.

In support of its decision not to apply AFA to Huarong and SMC for failing to report cast tamper data, Commerce relies on its determination in Final Results of Redetermination Pursuant to Court Remand *Tianjin Machinery Import & Export Corporation v. United States and Ames True Temper* ("Cast Pick Remand") (ITA July 20, 2004), that found cast picks to be outside the scope of the HFHTs orders. *See* Def.'s Resp. at 20. The Cast Pick Remand was issued after the respondents had submitted their responses both to Commerce's initial and supplemental questionnaires. *See generally* Def.'s Conf. App. (indicating that respondents submitted their responses in 2003). Although Huarong and SMC failed to submit any data concerning their sales of cast tampers, Commerce, because of the new determination that picks manufactured through a casting process were excluded from the scope of the orders, extended that finding to all cast-manufactured subject merchandise. Commerce cites this Court's holding in *Am. Silicon Technologies v. United States*, 27 CIT __, __, 273 F. Supp. 2d 1342, 1346 (2003), which allowed Commerce to apply a margin that was the subject of a pending appeal as support for its position. The Department understands this case to stand for the proposition that it "may follow [a] remand decision even if [it is] still pending." Def.'s Resp. at 20; *see D & L Supply Co. v. United States*, 113 F.3d 1220, 1224 (Fed. Cir. 1997) ("A margin that has not yet been overturned is presumed to

be accurate and can properly be used in the [best information available] determination."). Thus, having determined that cast picks, and consequently cast tampers, were not included in the scope of the order, Commerce argues that "Huarong's and SMC's sales of non-subject [cast tampers] [are] immaterial to Commerce's determination and, thus, Commerce properly exercised its discretion," in deciding not to apply AFA. Def.'s Resp. at 20.

Initially, Ames insists that Commerce's final scope ruling in the Cast Pick Remand is irrelevant to the question of whether Huarong and SMC were required to report their sales information for cast tampers. *See* Def.-Int.'s Br. at 21. Ames stresses that the subject tampers, while manufactured through a cast process, were not excluded from coverage under the order. *Id*. That being the case, Ames contends that the application of AFA is required because Huarong and SMC failed to cooperate to the best of their ability by not complying with Commerce's request for data on the tampers. *Id*. at 22.

> [The Cast Pick Remand] . . . would only apply to the order on picks and mattocks. It would have no relevance with respect to tampers, which are explicitly included in the order covering bars, wedges, and track tools. Therefore, absent a scope ruling directly on tampers, th[e] [bars/wedges] order would remain unaffected.

*Id*. at 23.

Relying on this argument, Ames next challenges what it refers to as Commerce's "arbitrary" decision to apply AFA for failure to report data on forged tampers and to refrain from such application with respect to similarly absent data on cast tampers.  *Id*.  Specifically, Ames argues that:

> Commerce applied AFA to TMC and Huarong due to their
> failure to provide requested data for sales of forged
> tampers and scrapers, but declined to do so on Huarong
> and SMC due to their failure to report cast tampers.
> There is no basis for such an arbitrary distinction.
> There is no final scope determination on any of these
> products . . .  If Commerce begins to make distinctions
> on how to report sales based on the later results of
> any scope proceeding, it establishes a precedent that
> will only encourage respondents not to report currently
> subject sales.

*Id*.


The text of 19 U.S.C. § 1677e(b) gives Commerce significant discretion to decide whether to apply AFA when calculating a respondent's antidumping duty rate.  As such, the statute does not require Commerce to use an adverse inference in every instance where a respondent has not supplied information.  *See AK Steel Corp. v. United States*, 28 CIT __, __, 346 F. Supp. 2d 1348, 1355 (2004).  Indeed, this Court has found that:

> "[T]he purpose of section 1677e(b) is to provide
> respondents with an incentive to cooperate, not to
> impose punitive, aberrational, or uncorroborated
> margins." [Plaintiff] apparently interprets *Nippon
> Steel* [*Corp. v. United States*, 337 F.3d 1373 (Fed. Cir.
> 2003)] to require Commerce to prove that an importer
> cooperated to the best of its ability every time that
> the agency decides *not* to apply adverse facts

available.  This runs counter to the discretion
afforded to Commerce by section 1677e(b) in the
application of adverse facts available.

*Id*. (quoting *F.LLI De Cecco Di Fillipo Fara S. Martino S.p.A. v.
United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)) (emphasis in
original) (footnote omitted).

Here, Commerce determined that applying AFA to Huarong and
SMC for their failure to report data on cast tampers would
neither aid the investigation nor serve to encourage their
cooperation.  For Commerce, because picks manufactured through a
cast process were found to be outside the scope of the HFHTs
orders, information relating to cast tampers was "immaterial" to
the review.[26]  Commerce maintains that it was not an abuse of
discretion to extend that finding to other cast tools since the
reasoning with respect to each tool would be the same.

Given the ruling on cast picks,[27] it was surely not

_____

[26]     On May 23, 2005, Commerce issued a final ruling finding
cast tampers to be outside the scope of the order covering
axes/adzes.  *See* Notice of Scope Rulings, 70 Fed. Reg. 55,110,
55,111 (ITA Sept. 20, 2005) (A-570-803: HFHTs, Finished or
Unfinished, With or Without Handles, From PRC).  As this
determination was made after the commencement of the instant
action, it is not part of the record, and, thus, cannot provide
the basis for Commerce's decision.  *See* 19 U.S.C.
§ 1516a(b)(1)(B)(i).

[27]     The orders covering HFHTs are applicable to merchandise
"manufactured through a hot forge operation . . . ."  Cast Pick
                                                    (continued...)

unreasonable for Commerce to conclude that other cast tools

should be treated in the same manner.  As a result, the court

finds that it was within Commerce's discretion to not require the

submission of unneeded data.  *See Timken Co. v. United States*, 18

CIT 486, 489, 852 F. Supp. 1122, 1126 (1994) ("It is well-

established . . . that Commerce has broad discretion with regard

to when the use of [AFA] is appropriate. . . .  If, however,

Commerce did receive all the data or exercise[d] its broad

discretion in this matter and deemed the missing information

unnecessary, then the dumping margin need not be recalculated.").

Thus, Commerce properly refrained from using facts otherwise

available under 19 U.S.C. § 1677e(a), and, in turn, appropriately

did not use an inference adverse to SMC's interests under 19

U.S.C. § 1677e(b).


    E.    Valuation of Pallets: Use of Surrogate for Scrap Steel

    Ames next takes exception to Commerce's valuation of the

steel used by each plaintiff to manufacture its shipping pallets.

*See* Def.-Int.'s Br. at 24.  Ames contends that the Department

employed an incorrect surrogate price to value the steel, and

---

[27](...continued)
Remand at 3.  Thus, Commerce cited the fact that "it is
undisputed that casting and forging are two separate and distinct
production processes . . .[,]" as the basis for its ruling that
cast picks were not included within the scope of the orders.  *Id.*
at 5.

that Commerce did not account for other necessary factors involved in the pallet manufacturing process.  *Id.*

For its part, Commerce has asked for a voluntary remand of this matter, pointing to this court's holding in *Shandong Huarong Mach. Co. v. United States*, 29 CIT __, __, slip op. 05-54 at 20–22 (May 2, 2005) (not published in the Federal Supplement). *See* Def.'s Resp. at 32 ("Because [it] is revisiting the valuation of pallets in the context of [another] remand, [Commerce] respectfully requests a voluntary remand concerning this issue for further analysis.").

The court agrees that this matter should be remanded to Commerce for further analysis.

F.   Calculation of Movement Charges: Additional Expenses

Pursuant to 19 U.S.C. § 1677a(c)(2)(A), Commerce shall reduce the price used to establish export price[28] ("U.S. price") by "the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject

---

[28]     "Export price" is "the price at which the subject merchandise is first sold . . . before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States . . . ."  19 U.S.C. § 1677a(a).

merchandise from the original place of shipment in the exporting
country to the place of delivery in the United States . . . .”
19 U.S.C. § 1677a(c)(2); *see Dupont Teijin Films USA, LP v.
United States*, 27 CIT __, __, 273 F. Supp. 2d 1347, 1349 (noting
that “export price” is “sometimes referred to as ‘U.S. price.’”).
Ames argues that, in its analysis, Commerce employed a surrogate
value that did not account for all of the additional expenses
incurred by the respondents, and thus failed to deduct those
expenses from the U.S. price.  *See* Def.-Int.’s Br. at 28.
Commerce argues that, “[b]ased upon its experience, . . . the
miscellaneous handling expenses and containerization charges
alleged by Ames, to the extent they were incurred, are captured
by the brokerage and handling and ocean freight surrogates used.”
Def. Resp. at 29; *see also* Issues and Decision Mem. at 14.  Thus,
Commerce contends that, had it deducted the costs that Ames
urges, the potential for double-counting would have increased as
would the potential for an inaccurate calculation.

Ames insists that Commerce’s calculation of moving charges
based on an Indian surrogate value derived from Certain Stainless
Steel Wire Rod from India, 64 Fed. Reg. 856 (ITA Jan. 6, 1999)
(final results) (“Steel Wire Rod From India”), failed to
consider, among other things, loading and containerization costs
incurred by plaintiffs in the course of shipping the subject

merchandise to the United States.  *See* Def.-Int.'s Br. at 28.

Ames further claims that:

> The Department's decision is unsupported by substantial evidence, especially when it conceded that the exporter might have incurred certain expenses that were not part of the surrogate value used by the Department.  Such an approach is in direct conflict with the Department's obligation to calculate accurate dumping margins.  If it is reasonable to assume that the exporter ultimately would pay for these costs, then the Department cannot ignore them and simply rely on the surrogate value without any adjustment. . . .  Quite to the contrary, the absence of such expenses from the original source document may be strong evidence that the surrogate value does not contain the list of expenses cited by Ames.

*Id*. at 29–30 (internal quotation marks omitted).  In other words, Ames maintains that Commerce cannot simply base its determination not to deduct the additional expenses on its assumption that "'the brokerage and handling surrogate value captures these costs.'" *Id*. at 30 (quoting Issues and Decision Mem. at 14).

Commerce asserts that its calculation was based on substantial evidence because nothing indicates that the costs provided by Ames were ever actually paid by plaintiffs.  *See* Def.'s Resp. at 30.  Put another way, Commerce "declined to value expenses that there was no evidence [plaintiffs] incurred."  *Id*.

> In addition, Commerce states that:

> We reviewed the public record of <u>Stainless Steel Wire Rod from India</u>, but found nothing to indicate whether the miscellaneous handling expenses cited by [Ames]

> . . . were covered by this surrogate value.  Although
> there are exceptions to this practice, it is the
> Department's experience that the freight forwarder
> typically pays all of the miscellaneous expenses
> necessary to export a product, then bills its customer
> (typically, the exporter) for these costs.  Absent
> evidence to the contrary, it is reasonable to assume
> that the brokerage and handling surrogate value
> captures these costs. . . .   Therefore, as it is likely
> that the brokerage and handling surrogate value . . .
> includes these miscellaneous handling expenses, to
> avoid possible double counting, we have not included
> the additional handling expenses identified by [Ames]
> in our calculation of net U.S. price . . . .

Issues and Decision Mem. at 14.  That is, without investigating

whether the "miscellaneous" costs were in fact counted in the

surrogate value, Commerce has nonetheless refrained from

deducting those values in its net U.S. price calculation.


The court finds that, despite the deference accorded to

Commerce's application of the antidumping statute, its conclusory

determinations cannot be said to be supported by substantial

evidence.  Indeed, this Court has previously remanded this issue,

stating that "[a]lthough the court agrees that Commerce need not

undergo an item-by-item analysis in calculating factors of

production, Commerce's calculations must nevertheless be

supported by substantial evidence."  *Shandong*, 29 CIT at __, slip

op. 05-54 at 23 (internal citation omitted)*; see also Burlington*

*Truck Lines, Inc.*, 371 U.S. at 168 (finding an agency decision

that failed to "articulate any rational connection between the

facts found and the choice made," to be unsupported by

substantial evidence.).  As in *Shandong*, the court remands the
issue of whether miscellaneous handling costs were properly
excluded from Commerce's net U.S. price calculation.  On remand,
if Commerce again finds that miscellaneous expenses such as
containerization and loading costs were included in the brokerage
and handling surrogate, it must provide a thorough explanation
for doing so.

G.    Application of AFA to SMC: Ocean Freight Methodology

Ames' next contention centers on Commerce's decision not to
apply AFA to SMC for using a methodology in calculating ocean
freight that Commerce found wanting.  *See* Def.-Int.'s Br. at 30.
For Ames, SMC's failure to change its methodology to comply with
Commerce's requests provides a sufficient basis to require
Commerce to apply AFA to this factor of production.  Ames argues
that:

> Commerce's determination is not based on substantial
> evidence. . . .  Ames is . . . concerned that, after
> explaining in detail in its brief how SMC failed to
> respond to Commerce's information requests, including
> language in the requests themselves where Commerce
> clearly states that the previous response was
> inadequate, Commerce arrived at the conclusion that SMC
> complied with its information requests.  This, combined
> with Commerce's verification findings that SMC
> significantly underreported its ocean freight without
> exception, demonstrates an arbitrary bias.  Therefore,
> Commerce's determination is without merit as it is
> arbitrary and unsupported by substantial evidence on
> the record.

Def.-Int.'s Br. at 30-31.

Commerce agrees that "SMC reported its per-unit ocean freight using an incorrect allocation methodology." Issues and Decisions Mem. at 23. Nevertheless, Commerce found that:

> Given that SMC complied with our requests for documentary evidence regarding its ocean freight expenses, and based on our discussions with company officials during verification, we conclude that SMC's use of an incorrect allocation methodology was not an attempt to distort its actual expenses, but rather stemmed from its belief that the allocation methodology was reasonable.

*Id*. at 23–24.

Because Commerce concluded that SMC had acted to the best of its ability in responding to a request for data, the Department declined to apply AFA. *Id*. at 23 (noting that "SMC's use of an incorrect allocation methodology was not an attempt to distort its actual expenses . . . .").

The court cannot agree with Ames' contention that Commerce's decision to calculate SMC's ocean freight without using an adverse inference demonstrated an arbitrary bias. The record indicates that SMC reported the requested information and that its use of an incorrect allocation method "stemmed from its belief that the allocation methodology was reasonable." *Id*. at 23–24. Moreover, the Issues and Decisions Memorandum makes it clear that the primary reason for Commerce's refusal to apply AFA to SMC was because "SMC complied with [the Department's] requests

for documentary evidence regarding its ocean freight expenses
. . . ." *Id.* at 23.  In other words, because SMC supplied the
necessary information, there was no need to use facts otherwise
available.  *See* 19 U.S.C. § 1677e(a).  Absent a valid decision to
use facts otherwise available, Commerce may not use an adverse
inference.  *See Gerber*, 29 CIT at __, 387 F. Supp. 2d at 1284
("If Commerce makes the findings, based on substantial record
evidence, that are required for invoking (b) of 19 U.S.C. §
1677e, it may use an inference that is adverse to the interests
of that party . . . .") (citation and internal quotation marks
omitted).  Thus, the court finds that Commerce's decision not to
apply AFA to SMC was supported by substantial evidence and
otherwise in accordance with law.

    H.    Commerce's Valuation of Ocean Freight Expenses
    Ames takes the position that Commerce's use of market
economy prices paid to a market economy supplier to value ocean
freight was unreasonable because the Department failed (1) to
determine whether the market economy purchases were significant
enough to provide a meaningful basis for valuing the input, and
(2) to determine whether what SMC and TMC purchased was
physically identical to the NME inputs.  In other words, Ames
argues that SMC's and TMC's market economy purchases did not
provide a sufficient basis upon which Commerce could value ocean

freight.  Commerce states that, in valuing SMC's ocean freight,
it took an aggregate of SMC's invoices indicating purchases from
a market economy supplier that were paid for in market economy
currency.  Def.'s Resp. at 31.  Specifically:

> Because the market-economy purchases were significant,
> Commerce utilized SMC's invoices to value ocean
> freight.  19 C.F.R. § 351.408(c)(1) . . . .  Commerce
> considered the purchases in aggregate, as opposed to
> upon a port basis, as urged by Ames.  Ames cannot
> demonstrate that this methodology is unreasonable,
> instead, it simply proffers another methodology. . . .
> The methodology employed by Commerce is reasonable
> because, in determining normal value, ocean freight is
> one input.  Accordingly, it is reasonable to aggregate
> freight costs rather than to add an unnecessary layer
> of complexity by using port-by-port calculations, as
> Ames suggests.

*Id.*

Commerce attempts to justify its methodology by referring to
19 C.F.R. § 351.408(c)(1)[29] and noting that, when possible, it is

---

[29]    This regulation provides that:

> The Secretary normally will use publicly
> available information to value factors.
> However, where a factor is purchased from a
> market economy supplier and paid for in a
> market economy currency, the Secretary
> normally will use the price paid to the
> market economy supplier.  In those instances
> where a portion of the factor is purchased
> from a market economy supplier and the
> remainder from a nonmarket economy supplier,
> the Secretary normally will value the factor
> using the price paid to the market economy
> supplier.

19 C.F.R. § 351.408(c)(1).

preferable to use market economy purchases from market economy

suppliers paid for in market economy currency in valuing a factor

of production under 19 U.S.C. § 1677b(c)(4). *See* Def.'s Resp. at

31. Moreover, in response to Ames' claim that this methodology

was inappropriate for the present review, Commerce asserts that,

"even if Ames' proposed methodology[30] were reasonable, '[w]hen

Commerce is faced with the decision between two reasonable

alternatives and one alternative is favored over the other in

_____

[30]    Ames' proposed methodology suggests that:

> First, Commerce must conduct an analysis by
> order. . . . [T]here are in actuality four
> different orders corresponding to the four
> classes or kinds of merchandise [and]
> [l]ikewise, there are four sets of margin
> calculations per company . . . . Because
> there are four orders, and four margin
> calculations, Commerce must necessarily
> conduct four *Shakeproof* [*Assembly Components
> Div. of Ill. Tool Works, Inc. v. United
> States*, 23 CIT 479, 59 F. Supp. 2d 1354]
> analyses if doing so would improve the
> accuracy of the margin calculations.

> Second, Commerce failed to analyze whether
> the market economy inputs were "physically
> identical" to the non-market economy inputs
> . . . . A shipment from Shanghai to Los
> Angeles is not "physically identical" to a
> shipment from Shanghai to New York. . . .

> Commerce inappropriately addresses the issue
> of port-to-port analysis under the
> "significance" portion of the *Shakeproof*
> analysis. Under Commerce's analysis, the
> transportation represents a single input.
> Commerce's contention is facially incorrect.

Def.-Int.'s Br. at 31-32.

their eyes, then they have the discretion to choose accordingly.'" *Id.* (quoting *Tehnoimportexport UCF America v. United States*, 16 CIT 13, 18, 783 F. Supp. 1401, 1406 (1992)). Thus, it is Commerce's position that its choice of methodology, although different from what Ames would have employed under the same circumstances, was not unreasonable and was in accordance with both its regulations and the statute.

Pursuant to 19 U.S.C. § 1677b(c)(1) and the accompanying regulation, Commerce is to value the factors of production "based on the best available information regarding the values of such factors in a market economy country . . . ." 19 U.S.C. § 1677b(c)(1); *see also* 19 C.F.R. § 351.408(c)(1). "While Congress has left it within Commerce's discretion to develop methodologies to enforce the antidumping statute, any given methodology must always seek to effectuate the statutory purpose-calculating accurate dumping margins." *Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States*, 23 CIT 479, 483, 59 F. Supp. 2d 1354, 1358 (1999); *see also Allied-Signal Aerospace Co. v. United States*, 996 F.2d 1185, 1191 (Fed. Cir. 1993) (stating that the purpose behind the antidumping statute "is to facilitate the determination of dumping margins as accurately as possible within the confines of extremely short statutory deadlines.").

Here, Commerce chose to value SMC's ocean freight based on that company's aggregate market economy purchases.  Although Commerce insists that its decision to aggregate is reasonable, and that the resultant aggregated amount rendered the total significant, it has not given a sufficient explanation of why that is so.  Thus, the court remands this issue to afford Commerce an opportunity to provide a more complete explanation of its decision to aggregate.  *See Burlington Truck Lines, Inc.*, 371 U.S. at 168 (holding that an agency must "articulate [a] rational connection between the facts found and the choice made.").

I.    Circumstances-of-Sale Adjustment to TMC's Normal Value
      to Account for the Commission Paid to its U.S. Sales
      Office

Ames asserts that, because there is substantial evidence on the record to support a circumstances-of-sale adjustment to account for the commission paid by TMC to its U.S. affiliate, the calculation of normal value for TMC's U.S. sales of subject merchandise should not have been made using a surrogate value for selling, general and administrative expenses ("SG&A") that did not take the commission into account.  *See* Def.-Int.'s Br. at 33. In other words, Ames argues that the record supports an upward adjustment[31] of TMC's normal value to reflect the commission paid

---

[31]    Section 1677b(a)(6)(C) provides that normal value is to be

(continued...)

to its U.S. office, which, based on TMC's submissions, was
included in the reported gross unit price of the subject
merchandise and was paid for in a market economy currency through
a market economy bank.  *See id.*; *see also* Issues and Decisions
Mem. at 32.  Thus, Ames is seeking a circumstances-of-sale
adjustment.  A circumstances-of-sale adjustment is made in order
to "account for certain differences  . . . in the United States
and foreign markets."  19 C.F.R. § 351.410(a).  Normally, the
Secretary "will make circumstances of sale adjustments . . . only

---

[31](...continued)
> increased or decreased by the amount of any
> difference (or lack thereof) between the
> export price . . . and the price described in
> paragraph (1)(B) [normal value]. . . that is
> established to the satisfaction of the
> administering authority to be wholly or
> partly due to—
>
>> (i) the fact that the quantities in
>> which the subject merchandise is
>> sold or agreed to be sold to the
>> United States are greater than or
>> less than the quantities in which
>> the foreign like product is sold,
>> agreed to be sold, or offered for
>> sale,
>>
>> (ii) the fact that merchandise
>> described in subparagraph (B) or
>> (C) of section 1677(16)[defining
>> foreign like product] if this title
>> is used in determining normal
>> value, or
>>
>> (iii) other difference in the
>> circumstances of sale.

19 U.S.C. § 1677b(6)(C).

for direct selling expenses and assumed expenses."[32]  *Id*.

According to Ames, the level of data required for making a

circumstances-of-sale adjustment was present on the record, which

includes surrogate "sales values, the material values and the

overhead values such that Commerce can compare . . . these to the

commission rate . . . and determine whether to make an

adjustment."  Def.-Int.'s Br. at 35.  That is, Ames argues that

Commerce erred by refusing to make the circumstances-of-sale

adjustment even though it had sufficient information to do so.

Commerce first raises a procedural argument against Ames'

claim that a circumstances-of-sale adjustment should be made,

arguing that Ames has failed to exhaust its administrative

remedies regarding this issue.  *See* Def.'s Resp. at 26.  Indeed,

Commerce asserts that Ames is raising this claim for the first

time before this court, and, in so doing, has denied the

Department the chance to consider the argument.  *See id*.  In

response, Ames counters that it did, in fact, raise the issue of

whether the surrogate value used accounted for the commission

paid by TMC to its U.S. affiliate at the agency level.

---

[32]   "Direct selling expenses" are expenses "such as
commissions, credit expenses, guarantees, and warranties, that
result from, and bear a direct relationship to, the particular
sale in question."  19 C.F.R. § 351.410(c).  "Assumed expenses"
are "selling expenses that are assumed by the seller on behalf of
the buyer, such as advertising expenses."  19 C.F.R. §
351.410(d).

Specifically, Ames contends that:

> [It] should not be penalized for having taken slightly
> different positions before the agency and before this
> Court.  First, Ames did raise the current issue at
> appeal with this Court in front of Commerce during the
> administrative review.  The core issue is exactly
> identical – whether Commerce should increase TMC's
> normal value to account for the commission paid to its
> U.S. sales office.  Ames has taken only a slightly
> different position with respect to the methodology used
> in calculating the amount of the increase.  Second,
> Ames had only stated in the administrative review that
> "there is no indication that the preliminary surrogate
> for any factor already includes a commission."  It
> never stated that "there was no evidence that the
> surrogate company's financial statements reflected the
> payment of selling commissions," as alleged by
> [Commerce].

Def.-Int.'s Rep. Br. to Def.'s Resp. to Huarong's and Ames' Mots.

J. Ag. R. ("Def.-Int.'s Reply") at 12.

In the alternative, Commerce argues that its determination was simply in keeping with its past practice of "[i]n [export price] situations, . . . not mak[ing] circumstances-of-sale adjustments in NME cases as the offsetting adjustments to [normal value] are not normally possible."  Issues and Decisions Mem. at 32.  Commerce also makes the related assertion that, in its view, the record did not contain substantial evidence to support such an adjustment.  *See* Def.'s Resp. at 28.

The court recognizes that 28 U.S.C. § 2637(d) instructs this court to, "where appropriate, require the exhaustion of

administrative remedies." *See United States v. Maxi Switch*, 22 CIT 778, 785, 18 F. Supp. 2d 1040, 1046 (1998). "The exhaustion doctrine requires a party to present its claims to the relevant administrative agency for the agency's consideration before raising these claims to the Court." *Ingman v. U.S. Sec'y of Agric.*, 29 CIT __, __, slip op. 05-119 at 7 (Sept. 2, 2005) (not published in the Federal Supplement).

It also true that Commerce is accorded significant deference when determining whether to make a circumstances-of-sale adjustment. *See NTN Corp. v. United States*, 28 CIT __, __, 306 F. Supp. 2d 1319, 1340 (2004). Moreover, because of the "imprecise information for distinguishing between direct and indirect selling expenses in the surrogate SG&A source . . . and the absence of non-NME information about what direct selling expenses are included in [export price] . . .," Commerce maintains an established practice of not making circumstances-of-sale adjustments in NME cases. Def.'s Resp. at 28; *see*, *e.g.*, HFHTs, Finished or Unfinished, With or Without Handles, From the PRC, 68 Fed. Reg. 53,347 (ITA Sept. 10, 2003); Final Determination of Sales at Less Than Fair Value: Foundry Coke Products From the PRC, 66 Fed. Reg. 39,487 (ITA July 31, 2001); Issues and Decisions Mem. at 32.

Here, it is evident that Ames' statement at the agency level that "there is no indication that the preliminary surrogate for any factor already includes a commission," can be read as sufficiently raising the same argument presented in the instant action, i.e., that a circumstances-of-sale adjustment should be made. Def.-Int.'s Reply at 12. Thus, the court cannot agree with Commerce's contention that Ames has failed to exhaust its administrative remedies.

As to the substance of Ames' claim, it is apparent that Commerce's past practice to refrain from making circumstances-of-sale adjustments in NME situations is based on its conclusion that, in most such cases, there is not enough information on the record to make a determination based on substantial evidence. While this may be true in most cases, the court observes that Commerce does not cite any evidentiary basis for its determination in this case, other than its past practice. For that reason, the court remands this issue to Commerce to allow the agency to further explain its determination that the record here was devoid of substantial evidence to permit a circumstances-of-sale adjustment.

    J.    Assessment Instructions to Bureau of Customs and Border Protection

Finally, Ames insists that Commerce erred by not specifically instructing Customs to liquidate forged tampers at the PRC-wide rate applicable to bars/wedges, i.e., 139.31%.  *See* Def.-Int.'s Br. at 36.  Ames provides two reasons as to why tampers should be singled-out in the instructions.  First, it argues that Commerce did not adhere to its statement in the Final Results that it would instruct Customs to liquidate the merchandise in accordance with its Final Results.  *Id.; see* Final Results 69 Fed. Reg. at 55,584 ("The Department will issue appraisement instructions directly to [Customs] upon the completion of the final results of these [] reviews.").  For Ames, the instructions were deficient because, despite language in the Final Results indicating that "as tampers are subject to the bars/wedges order, [Commerce] will instruct [Customs] to liquidate entries of tampers . . . at the AFA rate of 139.31 percent," the Department "failed to include any language [in the instructions] directing [Customs] to liquidate tampers."  Def.-Int.'s Br. at 36 (internal citation and quotation marks omitted).  Second, Ames contends that detailed instructions are necessary to prevent Customs from liquidating the tampers at the lower 27.71% rate applicable to hammers/sledges.  *See id.* at 37 ("[Customs] has ruled that tampers should be classified as hammers under the HTS . . . .  Thus, absent specific instructions . . . the

Department's intent to liquidate tampers at the rate for bars
will go unfulfilled. . . .").


Commerce's first argument is phrased as one contesting the
court's subject matter jurisdiction over Ames' claim.  *See* Def.'s
Resp. at 32–33.  According to Commerce, "the Court's residual
jurisdiction is limited and, with regard to liquidation
instructions, may be asserted only if the instructions differ
from the final results . . . ."  *Id*. at 32.  In other words,
because its instructions comply with the Final Results, Commerce
argues that there is simply nothing to litigate.


Although Commerce couches its first argument in terms of
subject matter jurisdiction, its assertion is more accurately
viewed as disputing the substance of Ames' allegation, i.e., that
the instructions are not sufficient to carry out Commerce's
intent.  Commerce suggests that, if Ames is concerned that
Customs will liquidate tampers under the incorrect rate, Ames
should register its complaint with that agency.  *See* Def.'s Resp.
at 33.  Moreover, Commerce states that "there is no evidence that
Customs is not effectively implementing the final results of
review of the order upon HFHTs."  *Id*.  That is, Customs has done
nothing to require a special instruction that specifically
identifies how to liquidate tampers.  Commerce emphasizes that,

"to specifically identify tampers, and not the various other heavy forged hand tools subject to the antidumping duty order, would, at best, be unnecessary, and, at worst, create confusion." *Id.*

It is well settled that this Court has jurisdiction to hear challenges to liquidation instructions. *See Shinyei Corp. of Am. v. United States*, 355 F.3d 1297, 1304, 1305 (Fed. Cir. 2004) ("'[A]n action challenging Commerce's liquidation instructions is not a challenge to the final results, but a challenge to the 'administration and enforcement' of those final results . . . . Thus, . . . [s]ection 1581(i)(4) grants jurisdiction to such an action.'") (quoting *Consol. Bearings, Co. v. United States*, 348 F.3d 997, 1002 (Fed. Cir. 2003)).[33]  Thus, this court has jurisdiction to hear Ames' claim.

Because Ames' claim is based in the APA, the applicable standard of review is that provided in 5 U.S.C. § 706.  That is, the court will "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary,

---

[33]    Under 28 U.S.C. § 1581(i)(4), the court has jurisdiction to hear "civil actions against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . . [the] administration and enforcement with respect to the matters referred to in [28 U.S.C. § 1581(i)(1)-(3)] or [28 U.S.C. § 1581(a)-(h)]."

capricious, an abuse of discretion, or otherwise not in

accordance with law . . . ."  5 U.S.C. § 706(2).  Applying this

standard, the court finds that Commerce's issuance of liquidation

instructions that did not specifically list tampers under the

bars/wedges order was not arbitrary or capricious.[34]  Here,

Commerce provided Customs with instructions to liquidate

plaintiffs' entries pursuant to the rates contained in the Final

Results, but did not specify which tools were included under each

category.  *See* Def. Conf. App., Ex. 14.  In other words, the

instructions uniformly applied to each respondent in that, for

each company, Commerce generally directed Customs how to

liquidate entries of bars/wedges, axes/adzes, hammers/sledges,

and picks/mattocks.  *Id*.  These instructions, then, reflect the

determination found in the Final Results.  That Customs might, at

---

[34]     Commerce's regulations provide, in relevant part, that:

Not later than seven days after receipt of
notice of an affirmative final injury
determination by the Commission . . . the
Secretary will publish in the Federal
Register an "Antidumping Order" . . . that:

(1) Instructs the Customs Service
to assess antidumping duties . . .
on the subject merchandise, in
accordance with the Secretary's
instructions at the completion of
each review . . . .

19 C.F.R. § 351.211; *see also Sandvik Steel Co. v. United States*,
164 F.3d 596, 598 (Fed. Cir. 1998) ("Customs applies and enforces
the antidumping orders, upon referral from Commerce.").

some point in the future, not follow these instructions, does not
present the court with an issue that is ripe for judicial
review.[35] *See Nat'l Park Hospitality Ass'n v. Dep't of Interior*,
538 U.S. 803, 807-08 (2003) (stating that the ripeness doctrine
is "designed to prevent the courts, through avoidance of
premature adjudication, from entangling themselves in abstract
disagreements over administrative policies, and also to protect
the agencies from judicial interference until an administrative
decision has been formalized and its effects felt in a concrete
way by the challenging parties.") (internal citation and
quotation marks omitted).  In the event that Customs does not
follow the instructions, Ames has a legal remedy.  *See J.S.
Stone, Inc. v. United States*, 27 CIT __, __, 297 F. Supp. 2d
1333, 1338 n.6 (2003), *aff'd*, 111 Fed. Appx. 611 (Fed. Cir. 2004)
("[M]isapplication of an antidumping order or the erroneous
imposition of antidumping duties by Customs may be protested and
suit brought before the court pursuant to § 1581(a)."); *see also
Xerox Corp. v. United States*, 289 F.3d 792, 795 (Fed. Cir. 2002).

_____

[35]    Ames disputes this by pointing the court to a May 10,
1996 Customs Ruling where Customs classified tampers as hammers
under the Harmonized Tariff Schedule of the United States
("HTSUS") 8205.20.6000.  *See* Def.-Int.'s Br. at 37 (citing
Customs Ruling NY A81379 (May 10, 1996).  Indeed, this ruling
stated that the tamper head acted like a hammer.  This alone,
however, is insufficient to require Commerce to delineate every
possible HFHTs entry under each category for all respondents.

Based on the foregoing, the court holds that Commerce's instructions complied with the Final Results, and, thus, were not arbitrary, capricious, or an abuse of discretion, and were in accordance with law.  Therefore, the court sustains Commerce's liquidation instructions.


CONCLUSION

In accordance with the foregoing, the court sustains in part, and remands in part Commerce's Final Results.  Commerce's remand results are due on September 7, 2006, comments are due on October 9, 2006, and replies to such comments are due on October 20, 2006.


 /s/Richard K. Eaton 
Richard K. Eaton


Dated:    June 9, 2006
          New York, New York